UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: BELK PROPERTIES, LLC, Debtor        CASE NO. 09-14656-DWH
                                           CHAPTER 11

OPINION

On consideration before the court is a motion for an order authorizing post-petition financing pursuant to §364(c)(1) and §364(d) of the Bankruptcy Code filed by the debtor, Belk Properties, LLC, ("Belk Properties"); objections and a response to said motion having been filed by Heritage Banking Group ("Heritage"), Avant Construction Company ("Avant"), the Office of the United States Trustee for Region 5 ("UST"), and BancorpSouth Bank ("BancorpSouth"); and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the subject matter of and the parties to this proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. This is a core contested proceeding as defined in 28 U.S.C. §157(b)(2)(A), (D), and (O).

II.

The debtor, Belk Properties, commenced a real estate development project in Oxford, Mississippi, which included the proposed construction of two three-story commercial buildings and a boutique hotel. The project was to be undertaken in three phases: Phase I involved the construction of a three-story multi-purpose building, which is partially complete; Phase II contemplated the razing of an existing single story building, followed by the construction of a second three-story multi-purpose building; and Phase III involved the construction of the hotel.

Heritage is the construction lender for the project and is now owed on Phase I the sum of $4,176,241.15, which is secured by a first deed of trust encumbering the entire development. Avant was the primary contractor for the Phase I project and is currently owed the sum of approximately $347,965.96, for which it has filed a construction lien in the Office of the Chancery Clerk of Lafayette County, Mississippi. BancorpSouth has an unpaid unsecured claim in the sum of $287,676.81, which is guaranteed by principals of Belk Properties, as well as, by Belk Ford-Mercury, a corporate automobile dealership owned by the principals of Belk Properties. The proceeds from the BancorpSouth loan, which is evidenced by an unsecured promissory note, were utilized for the initial engineering and architectural services that were performed for the project. Initially, the cost of Phase I was estimated to be approximately $4,000,000.00, but this sum has been significantly exceeded, and the project is far from being completed.

Belk Properties is now without funds to complete Phase I or to perform any preparatory architectural and consultation work necessary for Phases II and III. Belk Properties attempted to obtain funding from several sources to continue the development without success. It ultimately contacted Meadowbrook Capital, LLC, ("Meadowbrook"), which has agreed to lend funds to complete Phase I, and to pay certain professional fees, architectural fees, consulting fees, etc., related to the overall project. Meadowbrook has expressed an intention to lend the sum of $2,000,000.00, which it proposes to expend as follows:

| | |
|---|---:|
| Architectural Costs, entire development | $ 200,000 |
| Finish Phase I construction | 1,200,000 |
| Floor 1, Phase I retail/restaurant build out ($30/sf) | 170,000 |
| Hotel Consulting, Feasibility (HVS) | 125,000 |
| Professional Costs (legal, due diligence, financial) | 180,000 |
| Management Fee | 50,000 |
| Acquisition Fee | 75,000 |
| **Total** | **$2,000,000** |

(See Debtor's Exhibit 4)

Belk Properties and Meadowbrook have requested the court to approve this post-petition financing pursuant to §364(c)(1) and §364(d) of the Bankruptcy Code which are set forth as follows:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> . . . . . .
>
> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
> (A) the trustee is unable to obtain such credit otherwise; and
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

The conditions of this financing were set forth on a Term Sheet attached to the motion to approve the post-petition financing. Some of the more significant conditions are set forth as follows:

> 1. Paragraph 1e. provides that as a condition to the advancement of funds for post-petition financing, Meadowbrook must obtain a final, non-appealable order from the United States Bankruptcy Court for the Northern District of Mississippi

3

granting a superpriority, post-petition and senior lien pursuant to 11 U.S.C. §364(c) and (d)(1), subordinating the lien of Heritage and Avant to the post-petition financing. The Meadowbrook lien and priority shall survive the confirmation of any plan in Belk Properties' Chapter 11 bankruptcy case or the conversion to a case under Chapter 7 of the Bankruptcy Code.

2. Meadowbrook would take control of management responsibilities for Belk Properties. This, in effect, divests the debtor of control in favor of Meadowbrook. Paragraph 2a. states, "Meadowbrook shall have full and absolute control over Phase I of the project." Paragraph 2c. states, "Meadowbrook shall be substituted as Chief Manager of Belk Properties."

3. Paragraph 2b. states, "Control of equity interest in Belk: At funding of post-petition financing, Meadowbrook Capital shall obtain a controlling interest in Belk which shall be 51% subject to increase in the event of the exercise of options to convert fees to additional equity."

4. Paragraph 2d. provides that Meadowbrook shall be paid a management fee of $50,000.00 which may be convertible to equity at the option of Meadowbrook.

5. Paragraph 2e. provides that Meadowbrook shall be paid a post-petition financing fee in the sum of $75,000.00 which shall be converted to additional equity at the option of Meadowbrook.

6. Paragraph 2f. provides a break-up fee/due diligence reimbursement for Meadowbrook in the sum of $25,000.00; this fee shall be entitled to a superpriority administrative expense status and senior lien status over the existing liens of Heritage and Avant.

7. Paragraph 3a. provides that Meadowbrook has the authority to issue additional equity in Belk Properties up to a total 90% ownership interest. The current principals of Belk Properties would be permitted to retain a 10% equity interest.

8. Paragraph 3c. initially provided that Meadowbrook had the right to sell the development properties owned by Belk Properties subject to certain "matching opportunities" which would be available to the Belk Properties principals. The court appreciates that, in its post-hearing memorandum, Meadowbrook added clarification to this provision, which the court thought was problematic, by including language that any sale would be subject to the approval of the court prior to consummation.

9. Paragraph 4c. initially provided that Belk Properties shall not have the right to utilize any of the proceeds of the post-petition financing or proceeds or profits of

the operations of Belk Properties for any purpose other than payment of approved budgetary expenditures. Belk Properties shall not have the right or ability to utilize any of the post-petition financing funds for the payment of any indebtedness of any related entity. However, Meadowbrook consents to Belk Properties making regular monthly payments on the claim of BancorpSouth provided that the BancorpSouth indebtedness is reamortized over a period of not less than 30 years or on such other terms as the parties may agree to in a signed writing. (BancorpSouth objected to this provision indicating that it was prohibited from extending credit for such a lengthy period of time.)

In its post-hearing memorandum, Meadowbrook explained that the original intent of this provision was to limit the use of the funds being loaned exclusively for improvements to the project and not for servicing unsecured debts. However, because Meadowbrook recognized the "ripple" effect that a default on the BancorpSouth debt could have, i.e., serious repercussions for the individual and corporate guarantors, it inserted the conditional permission to repay the BancorpSouth debt in monthly installments.

Although the proposed corrective paragraph attempts to rectify Meadowbrook's dictation of payments by Belk Properties through proposed court approval, it ultimately falters by allowing payments to be made on "other terms as the parties may agree to in a signed writing." Thus, the effectiveness of the corrective paragraph was significantly diluted.

### III.

In an effort to justify the subordination of the existing liens of Heritage and Avant to the proposed lien in favor of Meadowbrook, Belk Properties introduced an appraisal report which had initially been prepared for Heritage by Darrell W. Bullock, Bullock Appraisal Services, LLC. Bullock provided an "as is" market value appraisal, as well as, a liquidation value appraisal. He separated the appraisals into three tracts, which, although the numbering is different, conform to the three phases of the proposed development. Bullock's appraisals can be summarized as follows:

|  | "As Is" Market Value | Liquidation Value |
|---|---|---|
| Tract 1 (This would be identical to Phase I of the project, the partially constructed three-story building.) | $2,250,000.00 | $1,575,000.00 |
| Tract 2 (This would be identical to Phase III of the project, the proposed boutique hotel) | 1,460,000.00 | 1,022,000.00 |
| Tract 3 (This would be identical to Phase II of the project, currently a one-story building which houses two restaurants) | <u>3,100,000.00</u> | <u>2,170,000.00</u> |
| Total | $6,810,000.00 | $4,767,000.00 |

Not surprisingly, Bullock testified that the real estate market in Oxford, Mississippi, is presently "stagnant." He indicated that there were numerous condominium units in Oxford that were presently on the market. One of the proposed uses for the two commercial buildings was luxury condominium units to be situated on the third floor of each building. At one point, Belk Properties had a contract for the sale of a condominium in Phase I to Dr. Jay Underwood for the total sum of $1,280,000.00, but the current status of that contract is currently unknown. There was potentially a second condominium contract with Don Noblitt, but the status of that contract is also unknown. The court is certainly mindful that the completion of Phase I would enhance the value of the entire development, but continuing soon thereafter with Phase II and Phase III may necessitate a thoughtful "timing" examination. On the positive side, the two restaurants, Bouré and Lenora's, in the existing one story building on the Phase II tract are generating in excess of $93,000.00 annual rental income.

While the value of the overall project presently provides an equity cushion to the existing secured creditors, Heritage and Avant, it could well be insufficient to provide this adequate

protection if the proposed superior lien in favor of Meadowbrook were added to the mix. Indeed, if the actual value of the project were tilted toward Bullock's liquidation appraisal value, the effect of the proposed subordination would relegate both Heritage and Avant into undersecured positions. Unfortunately, this is not the only problem that the court perceives in the post-petition financing proposal that has been presented.

IV.

One of the issues that has been raised by the objectors to the post-petition financing is that the proposal effectively constitutes a *sub rosa* Chapter 11 plan of reorganization which violates the principals enunciated by the Fifth Circuit Court of Appeals in *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983). The court recognizes, of course, that the financing proposal is not a sale of the debtor's assets pursuant to §363(b) of the Bankruptcy Code[1]. However, if the financing proposal were approved by the court, Meadowbrook would effectively become the debtor. In addition to its status as the primary secured creditor, Meadowbrook would be the Chief Manager of the debtor, as well as, a 51% equity owner with relatively unlimited discretion to acquire, syndicate, or otherwise control an additional 39% ownership interest. Even as modified, the Term Sheet specifies that any plan of reorganization proposed by Belk Properties must be consistent with the Term Sheet provisions. It also loosely dictates the manner in which existing creditors of the bankruptcy estate are to be treated. In effect, the financing proposal is a clever way for the lender to gain control of the debtor's assets without going through the processes of a §363(b) sale.

---

[1] Hereinafter, all Code sections will be considered as sections of the U.S. Bankruptcy Code unless designated otherwise.

Both Meadowbrook and Belk Properties assert that they are not trying to avoid the scrutiny of the plan confirmation process. However, before Meadowbrook will consent to infusing the post-petition funding, it requires a final, non-appealable order approving the post-petition financing proposal which obviously incorporates the conditions set forth on the Term Sheet. In the opinion of the court, once the financing order is final and non-appealable, the plan of reorganization is a fait accompli, that is, it is an accomplished fact for all practical purposes. Indeed, while the underlying facts of this proceeding and *Braniff* are not identical, the purpose of the Meadowbrook post-petition financing proposal still violates the holding of *Braniff* because it achieves the same effect as a *sub rosa* Chapter 11 plan of reorganization.

Even more troublesome to this court is the fact that Meadowbrook, as the lender, would become the majority owner and the responsible party for the debtor. With the imprimatur of the court's potential order, Meadowbrook would be cloaked with the rights of a debtor-in-possession as contemplated by §1107 without having been duly appointed through the procedures of §1104(a). A debtor-in-possession should be a fiduciary as to all creditors of the bankruptcy estate. Meadowbrook's proposed position as the primary secured lender and superpriority administrative expense creditor does not reconcile well with the statutorily contemplated role of a disinterested fiduciary for all creditors.

While the court is certainly supportive of the Belk Properties' development, as well as, the effort by Meadowbrook to clarify its initial proposal for approval of the post-petition financing, the current proposal must be further modified in order to protect the existing creditors of this bankruptcy estate, as well as, the potential viability of Belk Properties itself. As a suggestion, the proposal should address the adequate protection concerns of the existing

creditors, as well as, a method to provide debt service to these creditors. (In this context, the court certainly recognizes that the expressed concerns of Avant for an immediate payment of its debt is highly unlikely under any circumstances.) Perhaps, Belk Properties and Meadowbrook could weave the post-petition financing proposal into a proposed plan of reorganization which could address the claims of the other creditors. Regardless, because of the reasons set forth herein, the court is compelled to deny the proposal as currently presented by Belk Properties and Meadowbrook.

A separate order will be entered consistent with this opinion.

This the 23rd day of December, 2009.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE