## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF MISSISSIPPI

---

IN RE:

BELK PROPERTIES, LLC                                No. 09-14656-DWH

         Debtor.                                        Chapter 11

---

## DISCLOSURE STATEMENT

---

## I.  INTRODUCTION

This Disclosure Statement (the "Disclosure Statement") is furnished by the Debtor Belk Properties, LLC, with the solicitation of votes for the Debtor's Plan of Reorganization dated January 15, 2010 (the "Plan").  Capitalized terms not otherwise defined herein shall have the meaning ascribed to those terms in the Plan.

This Disclosure Statement contains important information about the Plan. The purpose of this Disclosure Statement is to provide adequate information to enable creditors of the Debtor and other parties-in-interest to make an informed judgment with respect to voting to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN WHICH HAS ALSO BEEN PROVIDED TO YOU, SHOULD BE READ IN ITS ENTIRETY.  ADDITIONALLY, IT IS SUGGESTED THAT IT MAY BE ADVISABLE FOR CREDITORS AND OTHER PARTIES IN INTEREST TO CONSULT THEIR OWN COUNSEL OR OTHER ADVISORS WITH RESPECT TO THE MATTERS CONTAINED HEREIN.   FOR THE CONVENIENCE OF CREDITORS AND OTHER PARTIES IN INTEREST, THIS DISCLOSURE STATEMENT INCLUDES A DISCUSSION OF THE LEGAL BASIS FOR THE PROPOSED TREATMENT OF CERTAIN KEY CLAIMS.  THIS DISCUSSION IS QUALIFIED IN ITS ENTIRETY BY THE PROVISIONS OF THE PLAN ITSELF, WHICH DESCRIBE THE CLASSIFICATION AND TREATMENT OF ALL CLAIMS.**

## A. **OVERVIEW OF PLAN; SIGNIFICANT CLAIMS; THE PROJECT**.

Belk Properties owns the largest remaining, developable tracts near the Square in Oxford, Mississippi, with frontage at 309 North Lamar and on Jefferson Avenue. This tract has been fully approved for development as the three-story, mixed-use Vieux Carré project and is believed to be worth at least $9 million.

This Disclosure Statement discusses appraisal information already placed in evidence in this case by Heritage Banking Group. Additional information on value will be presented by an appraiser for the Debtor at the confirmation hearing on this Plan, if required.

### 1. **Overview of the Debtor's Plan**.

This Chapter 11 case is relatively simple. There are only two secured creditors, Heritage Banking Group ("Heritage") and Avant Construction, Inc. ("Avant"), both of which are significantly oversecured.

Heritage has been receiving $3,500 a month on its secured claim since approximately a month before the Petition Date from the lease payments for Bouré restaurant. The Debtor's Plan would increase this monthly payment.

Avant is not entitled, however, to receive any further payments on its claim until Phase 1 is completed under the terms of the AIA contract executed by the Debtor and Avant.

There is one large unsecured creditor, Bancorp South, whose debt is being serviced on a current basis by non-Debtor obligors. Bancorp South will be an "impaired" creditor for purposes of the Debtor's Plan, because its debt instrument has

matured and is being renewed with the agreement of the Debtor, subject to approval of this Court, on the terms described below and in the Plan.

There are two other potential creditors, Dr. Jay Underwood and Don Noblitt, who are parties to executory contracts for the purchase of luxury condominiums in Phases 1 and 2 of the Vieux Carré project.  Dr. Underwood and Mr. Noblitt have both confirmed that they support completion of the project and still want to purchase the luxury condominium units reserved for them under the existing agreements.  A letter to that effect from Mr. Noblitt is attached as **Exhibit A** to this Disclosure Statement.

In contrast to other condominium developments in Oxford, the Vieux Carré project includes a relatively small number of large units in a prime location near established restaurants and the Oxford University Club.  Other potential buyers and lessees have expressed interest, despite the present economy, in purchasing or leasing the remaining units in Phases 1 and 2 if the project proceeds.  Letters confirming this interest are attached as **Exhibit B** to this Disclosure Statement.

The Debtor's Plan is based on a revised term sheet for $2 million in post-petition financing to complete Phase 1 arranged by Meadowbrook Capital, LLC, of Jackson, Mississippi ("Meadowbrook").  A copy of the First Amended and Restated Term Sheet, reflecting changes offered to address specific concerns of the Court and creditors concerning the proposed post-petition financing is attached hereto as **Exhibit C**.

Finally, the Debtor's Plan provides for acceptance of back-up bids for purchase of this tract and the Debtor's related assets, including the opportunity of Heritage, Avant, and Meadowbrook to credit bid their claims, if the proposed post-petition financing does not close within 60 days after confirmation of the Debtor's Plan.

2.    **Overview of Treatment of Heritage Claim.**

As explained in more detail below, Heritage's claim is slightly less than $4.2 million and Avant's construction lien claim is, at most, $347,000.  Based on an "as is" value for the incomplete Phase 1 building, it is undisputed that the Vieux Carré project, including raw land, is worth at least $6.8 million.  **See Exhibit D** (introductory section to Darrell Bullock's appraisal for Heritage).

It is well-recognized that, when a creditor with an assignment of rents is oversecured, the Debtor has an interest in post-petition rents while the secured creditor has the right to "adequate protection," which can be supplied by the equity cushion in the creditor's collateral, by monthly payments, or by a mix of these or other measures as appropriate.

The Debtor's Plan provides that the monthly payment to Heritage, including the Bouré lease payment, will increase to $7,000 as debt service on Heritage's secured claim until Phase 1 is completed.  The Debtor's Plan also provides for an interest accrual and catch-up and for significant payments to reduce principal and interest, all as described in more detail below and in the Plan.

The Debtor's Plan provides that Heritage will (a) retain its lien, (b) retain all of its legal, equitable, and contractual rights under its loan documents, including the guaranties of Frank Belk and Richard Belk, to secure payment of its secured claim on the terms set forth herein; and (c) receive deferred cash payments under this Plan (i) totaling at least the amount of Heritage's Allowed Claim (the "principal amount test"); and (ii) having a present value, as of the effective date of the Plan, which is generally equal to the value of the collateral securing Heritage's Allowed Claim (the "present value" test).

4

Payment on Heritage's secured claim on the terms described herein are included in the projections attached hereto as **Exhibit E** (the "Projections").

The Debtor is in discussions with Heritage at the time this Disclosure Statement is being filed and hopes to reach agreement with Heritage on the proposed payment schedule. The payment schedule proposed by the Debtor in the Plan, however, meets the test for confirmation of the Plan by the Court under Section 1129(b)(2)(A)(i)(I)-(III) even if Heritage, as an impaired creditor, does not vote in favor of, or accept, the Plan.

**3.** **Overview of Treatment of Avant Claim.**

The Debtor's Plan and the Projections attached hereto provide for a $90,000 payment on Avant's claim upon completion of Phase 1 and for subsequent payments, but only to the extent required following a claims allowance procedure addressing the amount of this disputed claim.

The $90,000 payment is to be dedicated, by a joint check procedure, to payment of retainage and any other amounts still owed by Avant to subcontractors or vendors for work on or materials supplied for the Vieux Carré project, with no more than the amount determined by the Court in the claims allowance procedure to be paid to Capital Stucco, since it is disputed whether the stucco work was completed to the extent certified by Avant.

The Debtor's Plan provides that Avant, like Heritage, will (a) retain its lien, (b) retain all of its legal, equitable, and other rights in connection with its construction lien to secure payment of its secured claim on the terms set forth herein; and (c) receive deferred cash payments under this Plan (i) totaling at least the amount of Avant's Allowed Claim (the "principal amount test"); and (ii) having a present value, as of the

effective date of the Plan, which is generally equal to the value of the collateral securing Avant's Allowed Claim (the "present value" test).

The payment schedule proposed by the Debtor in the Plan for the Avant claim meets the test for confirmation of the Plan by the Court under Section 1129(b)(2)(A)(i)(I)-(III) even if Avant, as an impaired creditor, does not vote in favor of, or accept, the Plan.

### 4.    **Bankruptcy Code Provisions/Protections Affecting Plan Confirmation.**

In response to the Debtor's motion for approval of post-petition financing to complete Phase 1, the U.S. Trustee and Heritage filed objections based on the proposal constituting a sub rosa Plan under the **Braniff** decision and other precedent interpreting it in the Fifth Circuit.

The Debtor believes that its proposed Plan, including post-petition financing by investors identified by Meadowbrook, complies with all requirements for confirmation under the Bankruptcy Code.

The Plan describes the officers and directors who will serve as management of the Debtor as required under Section 1129(a)(5)(A)(i) of the Bankruptcy Code, which will include Lee Paris as Chief Manager, Frank Belk as Vice President, and Lance Gurley, as CFO and liaison on construction issues from the Effective Date the Debtor's Plan until this Chapter 11 case is administratively closed  .

The Plan provides that all monthly operating reports will require the signature of both the Chief Manager or CFO and of Frank Belk as Vice President, until the reporting obligations end.

Debtor will present evidence at the confirmation hearing to support a finding by the Court that the service of these officers is consistent with the needs of the creditors and equity security holders and the public interest as required for confirmation under Section 1129(a)(5)(A)(ii) of the Bankruptcy Code.

The Debtor's Plan is being proposed in good faith and not by any means forbidden by law, meets the "best interest of creditors" test (because each creditor will receive at least what they would receive in a liquidation), deals appropriately with the only priority claim, and is feasible and not likely to be followed by liquidation, except a liquidation provided for in the Plan. **See** Section 1129 of the Bankruptcy Code. As described above, the Debtor's Plan protects the interests of all creditors, including Heritage and Avant, even if they dissent and is confirmable.

As a result, the process for consideration and confirmation of the Debtor's plan involves compliance with all provisions of Section 1124 of the Bankruptcy Code concerning treatment of impaired claims, Section 1129 of the Bankruptcy Code setting out the requirements for confirmation of a Plan, and Sections 501, 502, 503, and 506 of the Bankruptcy Code concerning allowance of claims.

With the revisions to the Term Sheet to address the specific concerns raised by the U.S. Trustee and Heritage at the previous hearing and with the Debtor's seeking approval of the post-petition financing by confirmation of a Plan of Reorganization, the creditors and parties in interest in this case will not be denied the protection of any provisions of the Bankruptcy Code.

5.     **Background of the Project/Description of Parcels.**

The Belk family has owned a tract on North Lamar in Oxford, Mississippi, since the late 1920's when F.W. Belk owned and operated a garage and later an automobile dealership within a short walking distance from the Square.  **See** photographs attached as **Exhibit F**.

The Belk garage and dealership, with a street address of 309 North Lamar, was located on Parcel 200, a large parcel shown on the aerial view of the tract attached as **Exhibit G** hereto.  This parcel extends toward the public parking lot operated by the City of Oxford and is much larger than the footprints of the existing buildings on North Lamar, including the footprint of the partially completed Phase 1 building.

In recent years, Belk Properties purchased Parcel 129, sometimes referred to as the Butler Property, which is also shown on the aerial view attached as **Exhibit H**.  This purchase added significant frontage on Jefferson Avenue.

As a result, the Debtor now owns the last large tract with development potential in the City of Oxford's central business district.  The tract is more than 1.4 acres or, more precisely, 61,704 square feet.

There were a variety of uses on the tract in 2005, including an approximately 10,000 square-foot building with a partial basement that has been consistently leased over the years for retail and restaurant uses and is now leased to businesses including Bouré and Lenora's restaurants (the "Existing Building").

The Phase 1 building presently under construction is a three-story building that would include a total of 17,000 square feet of commercial, retail, and luxury condominium uses ("Phase 1").

The remaining undeveloped land owned by the Debtor, including the Butler Property (Parcel 129), is approximately 41,000 square feet.

**6.      Zoning/Site Plan Approvals, Height Variance, Demolition Permits.**

Belk Properties obtained significant zoning approvals, a height variance, and demolition permits which would allow virtually all of the tract to be developed as a three-story mixed-use development, with underground parking, known as Vieux Carré.  An example of one floor of the Vieux Carré project as designed and approved by the City of Oxford's planning department and planning commission is attached as **Exhibit I**.

The Debtor obtained these significant approvals and variances from the City of Oxford prior to the Central Business District Historic Preservation District being put in place.

The approvals were granted in Case Nos. 1200, 1237, and 1266 filed with the Oxford Planning Department and heard by the Planning Commmssion.  They include:

- A ten-foot height variance from the 35-foot limit in the Land Development Code which will allow the new buildings to be 45-feet tall (as tall as the Overstreet development to the South which includes the Oxford University Club).

- A special exception allowing 33% of the new development to be residential (permitting one story of each three-story building to be condominiums).

- Site plan approval of a three-story mixed-use development to be built around a T-shaped brick courtyard and atrium.

The Belk project also obtained the demolition permits necessary for the project before the Central Business District Historic Preservation District was put in place.

The Debtor also obtained approval by the historic preservation committee of the facade treatments facing the Chevron station to the North.

Artist renderings of the Vieux Carré project as designed by Pryor & Morrow and approved for construction on this site, showing the streetscape and T-shaped brick courtyard, are attached hereto as **Exhibit J**.

After the Debtor obtained these approvals, a proposal to develop a luxury hotel on the Church of Christ tract immediately to the North of the Belk tract (on the far side of Jefferson Avenue) was defeated, amid litigation and public outcry.  The demolition of a Victorian-era home, also on the far side of Jefferson from the Belk tract, resulted in outspoken public opposition to any further demolition not already approved in the central business district.

7.     **Response to City's Request for Proposals Concerning Public Parking**.

Belk Properties was one of three companies that responded to the City's request for proposals concerning public-private partnerships in developing public parking options for the City of Oxford and Square merchants.  Since the Belk tract backs onto significant acreage presently owned and operated by the City of Oxford as a single level parking lot, Debtor's management believes that the potential for such a project in the future remains a significant business opportunity for Belk Properties.

8.     **Vieux Carré – Planned as a Phased Development**.

Development by the Debtor of this tract has consistently been planned in three phases, two of which are shown on the aerial view attached **Exhibit H**.  The Debtor's Plan proposes to use the post-petition financing to complete Phase 1 and prepare to market and start work on Phases 2 and 3, when appropriate, based on advice of hotel

consultants, the economy, commitments for purchase of condominiums, and the local market for retail space.

Phase 1 involves completion of the partially-constructed new three-story building at the site. The Phase 1 building can include luxury condominiums on the top floor and commercial or retail uses, including hotel rooms, on the first and second floors. Phase 2 would involve replacing the existing one-story building where the Bouré and Lenora's restaurants are presently located with another three-story building. Phase 3 would involve development of the raw land behind the initial phases, for example, with a hotel.

**B.**     **PRE-CONSTRUCTION PURCHASE AGREEMENTS FOR LUXURY CONDOMINIUMS; LEASES FOR RESTAURANT AND RETAIL SPACE.**

Belk Properties has preconstruction purchase agreements for the most prestigious of the condominiums on the top floor of Phase 1 and Phase 2, each with balconies fronting North Lamar and with private courtyards. The first of these condominiums is to be completed by August 31, 2010, with the contract providing for extensions of that deadline for any "force majeure" events delaying completion.

The Debtor's Plan would assume the preconstruction purchase agreements with Dr. Jay Underwood and Don Noblitt under the "executory contract" provisions of the Bankruptcy Code. Debtor's management believes that, as a business matter, it is clearly in the best interest of the estate and all creditors to assume the $1.128 million contract with Dr. Underwood and to offer him a reasonable concession (of not more than a $100,000, approximately 10%, reduction in the agreed purchase price) based on changes in the market and delays in completing the construction of Phase 1.

The Debtor's Plan also proposes that the existing pre-construction agreement with Don Noblitt be assumed.  Both Dr. Underwood and Don Noblitt have provided letters confirming their continuing interest in purchasing luxury condominiums in the Vieux Carré project which are attached as **Exhibit A** to this Disclosure Statement.

The Debtor's Plan also proposes to assume all existing leases for the Bouré and Lenora's restaurant spaces.  The lease for the Bouré space has not been extended for a new annual term and is currently on a month-to-month basis.  The lease for the Lenora's space extends through September 30, 2010.  The owners of both restaurants have expressed interest in space in Phase 1 when it is completed, although no agreement has been reached on terms.

### C.    APPRAISALS; VALUATION.

The Debtor's Plan is based on the real property it owns having a value of approximately $9 million in the current market, although the Plan would be confirmable with a significantly lower value.  The $9 million value is consistent with the appraisal of Darrell Bullock prepared for Heritage and entered into evidence at the hearing on the motion for approval of post-petition financing, see **Exhibit D**, although additional appraisal information will be provided at the hearing on confirmation of the Plan, if required.

Mr. Bullock valued the property in three tracts, including an "as is" value for the Phase 1 building that deducted the estimated cost of completing the building as follows:

| | |
|---|---|
| Tract 1 (including the Phase 1 building) | $2,250,000 |
| Tract 2 | $1,460,000 |
| Tract 3 | $3,100,000 |
| TOTAL: | $6,810.000 |

Using this appraiser's own methodology, the amount spent on completing the Phase 1 building -- $1.3 million -- should be added to his value.

He also testified that he did not realize, and did not take into account, that there was a $1.28 million contract with Dr. Jay Underwood to purchase the first condo -- or any contracts at all or expressions of interest at all.

He used as comparables much smaller condos in developments with a much higher number of units and much less desirable locations, for example, High Cotton.

He testified that he was not aware of the 10-foot height variance and other zoning approvals for the whole tract, which gives the Debtor the ability to add a substantial third floor throughout the development – a factor that should increase the value of this tract by at least 20%.

Mr. Bullock also testified that he did not take into account that this tract owned by the Debtor is the last, large developable tract within 2 blocks of the Square.

If Mr. Bullock's appraisal is adjusted, using his own methodology to reflect $1.3 million of the post-petition financing being invested in finishing completion of the Phase 1 building, his appraised value would $8.1 million.  Using only a conservative 20% factor to reflect the 10-foot height variance and other matters discussed above, the appraised value would be $9.7 million.

Since Heritage Banking Group's construction loan claim is expected to be no more than $4.1 million and Avant's construction lien is estimated to have a value of, at most, $347,000, both of these creditors, the only significant creditors in this estate, are significantly oversecured at the time the Plan is being proposed and will still be

oversecured if the $2 million in post-petition financing is approved and funded as contemplated under the Debtor's Plan.

>       D.      **PROJECTIONS**.

The Debtor's Projections, prepared with the assistance of Meadowbrook Capital, are attached hereto as **Exhibit E**.  These Projections confirm that the Chapter 11 reorganization plan proposed by the Debtor is feasible and will provide for all creditors to be paid in full.

**PLEASE NOTE:  EVERY EFFORT HAS BEEN MADE TO PROVIDE REASONABLE PROJECTIONS AND ACCURATE FINANCIAL INFOR-MATION IN THIS DISCLOSURE STATEMENT, BUT THE PROJECTIONS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN PREPARED AND SUPPLIED BY THE DEBTOR AND HAVE NOT BEEN THE SUBJECT OF AN AUDIT.  NO REPRESENTATIONS CONCERNING THE PLAN ARE AUTHORIZED BY THE PLAN PROPONENT OTHER THAN AS SET FORTH IN THE PLAN AND THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEP-TANCE OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THE PLAN OR IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY-IN-INTEREST.**

The Projections are based on certain assumptions listed at the end of **Exhibit E**.

>       E.      **USE OF CASH COLLATERAL**.

Prior to the filing of the Petition in this Case, Heritage had scheduled a foreclosure on the Debtor's real property and sent a notice to the entity leasing the Bouré space that Heritage was exercising its right to have rents paid directly to the bank as a remedy for default under its assignment of rents.  A representative of Heritage contacted the owner of Lenora's restaurant _after_ the Petition Date and demanded that monthly lease payments be made directly to Heritage.  Three checks in the amount of $4,150.00 have been delivered to, but not cashed by, Debtor for monthly payments under the Lenora's lease.

Since Heritage is fully protected by its equity cushion in the Debtor's real estate and by the monthly payments proposed under the Plan, Debtor's Counsel does not believe that there is any basis for Heritage to receive any rents directly post-petition. The Plan and the Projections attached hereto, accordingly, assume that the Debtor will have the use of such cash collateral before and after confirmation of the Plan but that they will be used for adequate protection payments to Heritage and miscellaneous administrative expenses until Phase 1 is completed.

**F.      DISPUTE WITH AVANT CONSTRUCTION.**

Avant was hired as the construction manager for Phase 1 of the Vieux Carré project. The Debtor and Avant signed a contract for its services using a standard AIA form agreement which incorporates standard AIA "General Conditions" for construction projects of this type. Work began at the site in July 2007.

Significant disputes arose between the Debtor and Avant concerning the following issues:

(i)      **Inability to Complete Work on Schedule.**  By late Spring of 2008, it became clear that Avant was not going to meet the anticipated date for completion of the shell of the Phase 1 building in August 2008.

(ii)     **Problems with Payments of Subcontractors and Vendors.**  At one point in the project, it became clear (and was admitted by Avant) that invoiced amounts submitted by Avant for vendors and subcontractors on formal pay applications were not being paid by the time subsequent pay applications were submitted by Avant. Under the applicable AIA contract and General Conditions, submission of a subsequent pay

application constitutes a representation and warranty by the construction manager that all charges on previous pay applications have been paid.

    (iii)  **Failure to Provide a "Construction Control Estimate"**.  As difficulties with the project continued, the original architect, Pryor & Associates, the party who is responsible for managing contract compliance under the standard AIA documents and conditions, was terminated by Debtor's management, because the firm demanded a significant additional payment, in the range of $170,000 to continue work on the project.

    Debtor's management hired Joey Hagan, a licensed architect with Architecture, Incorporated, based in Memphis, Tennessee, in January 2008.  After becoming familiar with the status of the project and the contract documentation to date, Mr. Hagan demanded in writing that Avant prepare a formal "Construction Control Estimate."   In order to comply with the AIA requirements, a "Construction Control Estimate" must include (1) a list of drawings and specifications; (2) a list of clarifications and assumptions by the construction manager in preparing the estimate; and (3) a "statement of the actual or estimated commencement and estimated date of Substantial Completion."  See Section 2.2.4 of the contract between Belk and Avant (the "Avant Contract").

    The control estimate is also required to be approved in writing by the Owner once it is acceptable to the Owner.  See 2.2.5 of the Avant Contract.  While Avant prepared and periodically revised a document entitled "Construction Control Estimate" for the Vieux Carré project, it was July 2008 before any copy of Avant's internal document was provided to the Debtor, when Avant presented a "revised" estimate to the Belks.  In none of the versions in the Debtor's files does this document include the elements required under the Avant Contract in order to be considered a control estimate.

In addition, there is no evidence that Frank Belk or any other representative of the Debtor, the owner of the project, ever approved this document orally or in writing.

(iv) **Problems with Percentage of Work Certified as Complete; Submission of Charges Not Authorized by Contract.**  After Heritage required that the Debtor use Ken Collins of Construction Inspection Service, LLC (discussed in more detail below) rather than Joey Hagan to monitor the construction and review Avant's pay applications, problems continued to be encountered with the percentage of work being certified as complete on pay applications and inappropriate and unauthorized charges continued to be submitted by Avant on pay applications.

While not moving toward completion of the project, Avant began to request change orders to extend the payment of its monthly management fee and other monthly amounts paid under the "General Conditions" to Avant.  When it became clear that Avant was simply tacking on additional months without a completion date in sight, Frank Belk refused to sign pay applications tendered by Avant, although he paid on them.  Avant's final pay application was submitted in a format that could not be compared to the format of previous pay applications and was not signed by Frank Belk.

In September 2008, the Debtor terminated Avant as construction manager and began seeking estimates from other companies for completion of the Phase 1 building.

Avant's failure to perform as required under the AIA contract signed with the Debtor and failure to fulfill the promises made to Ken Collins in July 2008 concerning completion of the shell and internal build out have caused extensive damage to the Debtor and to other creditors in this case.

**G.      ROLE OF HERITAGE BANKING GROUP IN MONITORING COSTS AND DEALING WITH DELAYS.**

At a critical point in this project (late March or early April of 2008), Steve Potts of Heritage demanded that the Debtor use Ken Collins of Construction Inspection Service, LLC, based in Madison, Mississippi, to monitor Avant's construction activity and review its pay applications rather than Joey Hagan, the architect that had been hired by the Debtor.

While Mr. Collins has extensive experience in construction management, he is not a licensed architect and was not in a position to take the type of actions an architect could have taken in dealing with Avant's failure to perform on this project.

The AIA contract explicitly provides for use of an architect to facilitate the process of confirming that construction is being completed according to plans and that payments requested are appropriate.

By making this decision, Heritage assumed a role in management of this Debtor in a way that harmed the Debtor, its owners, and the other creditors in this case.  For example, to the extent that additional architectural drawings or specifications might have been necessary or useful, Heritage interfered with the ability of the Debtor to address those issues with the professional of their choice.

**H.      MEADOWBROOK CAPITAL; POST-PETITION FINANCING.**

Meadowbrook Capital, LLC, based in Jackson, Mississippi, is a well-respected provider of innovative investment strategies, as well as fund management, advisory, and investment banking services to high net worth individuals, institutions, and project operators.   Its principals include LeRoy H. Paris, II ("Lee"), its Chief Executive Officer,

Dan Hall, its Chief Operations Officer, and Lance Gurley, Vice President and National Sales Director.

Lee Paris' family made the leading donation that made the construction of the Paris-Yates Chapel possible on the University of Mississippi campus.  All of the principals in Meadowbrook Capital are familiar with Oxford, the University of Mississippi, and its supporters.

Meadowbrook Capital is committed to utilizing its in depth market knowledge, as well as the combined experience of its principals in investment and project management, to mitigate risk and generate stable returns for the firm's clients.

The leadership team's qualifications include investment, advisory, and management experience in all facets of real estate (from development and value-add, to core assets and income-producing properties), private equity, and venture capital.

Meadowbrook Capital has investors interested in providing $2.0 million in post-petition financing, convertible into equity, on the terms and conditions set on the Term Sheet attached hereto as **Exhibit C**.  Over the last year, Debtor's management has met with numerous potential investors and believes that Meadowbrook is clearly the preferred choice to provide construction management and manage post-petition financing and investments in the Vieux Carré project.

Under the terms of the proposed DIP Loan, Meadowbrook Capital would also provide construction management services for the completion of the Phase 1 building.

Meadowbrook Capital proposes that the following construction, design, and hospitality industry professionals be retained by the Debtor for the completion of Phase 1 and preparation for Phases 2 and 3:

- Benchmark Design, a firm of architects and planners, based in Atlanta, Georgia with extensive experience with mixed-use, historical, and hospitality projects.

- Xi Builders, also based in Atlanta, Georgia, with twenty years construction experience including mixed use projects similar to the Vieux Carré project.

- HVS Hotel Management – a well-respected, hotel consulting firm for assistance in planning Phase 3 of the Vieux Carré project, with the amount to be paid to HVS Hotel Management from the post-petition financing expected to be no more than $125,000.

**F.   <u>BACK-UP BIDS</u>.**

The Debtor's Plan contemplates that the Debtor may receive back-up bids for purchase of the property before and after confirmation.  If the post-petition financing proposed by Meadowbrook Capital is not put in place within 60 days after confirmation of this Plan, the Debtor will have the option after notice and a hearing of selling the tract and related assets in a Section 363 sale to the best bidder, so long as all quarterly fees owed to the United States Trustee, all administrative expenses of this Case, the secured Allowed Claims of Heritage, Avant, and Meadowbrook, are fully paid at the closing of that sale, with any surplus above said claims to be distributed to the holders of priority and unsecured Allowed Claims and, to the extent available, to the holders of equity interests in the Debtor.  Debtor will file a motion for approval of the procedures to be used in any Section 363 sale with the Court.  In any event, Heritage, Avant, and

Meadowbrook will be entitled to credit bid their Allowed Claims in connection with any such sale.

G.    **RECOMMENDATION OF THE PLAN PROPONENT**.

Debtor's management believes that the reorganization outlined in the Plan and in this Disclosure Statement is based on a business model that will benefit all of its creditors and preserve value.  As a result, in the opinion of Debtor's management, approval of the Plan is in the best interest of all creditors and parties-in-interest.

## II.  VOTING ON THE PLAN

Section 1126(c) of the Bankruptcy Code provides that a class of creditors accepts a plan if the plan is accepted by creditors holding at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that have voted to accept or reject the plan.  Only those creditors, however, holding allowed claims are entitled to vote.  See 11 U.S.C. § 1126(c).  All classes of creditors which are impaired under the Plan are entitled to vote.

A ballot for the purpose of voting on the plan is being forwarded with this Disclosure Statement to each creditor who was listed in Debtor's schedules or in the Plan as having an unliquidated, disputed or contingent claim and to each creditor who has filed a proof of claim form with the Bankruptcy Court.  The ballot of a creditor whose Claim is the subject of a pending objection is so indicated; and such creditor will not be entitled to vote to the extent that its Claim is subject to dispute unless an order provisionally allowing such claim is entered by the Bankruptcy Court.

In order to accept or to reject the Plan, each creditor, equity security holder, and other party-in-interest must execute the ballot and return it in accordance with the ballot instructions and the Order and Notice which will accompany the ballot.

## III.  DEBTOR'S MANAGEMENT

Frank Belk and Richard Belk are the sole members and managers of the Debtor, each holding a 50% limited liability company membership interest in Belk Properties. Lessie Belk, Frank Belk's wife, has invested a substantial amount of time in the presentations to the Oxford Planning Commission, the historic preservation committee, potential purchasers of condominiums, and potential commercial tenants.

Following confirmation of this Plan, as described in the Term Sheet attached hereto as **Exhibit C**, the investors providing the $2 million in financing will have a 51% equity interest in the Debtor, and Frank Belk and Richard Belk will retain a total of 49% of the equity interest in the Debtor.   Meadowbrook will provide construction management services for the completion of Phase 1, and Frank Belk will continue to act as an officer of the Debtor and will review and sign all operating reports required to be filed with the U.S. Trustee.   An officer appointed by the Meadowbrook investors will also review and sign each operating report.

## IV. BACKGROUND AND EVENTS LEADING TO THE CHAPTER 11 CASE

The difficulties with monitoring and controlling costs of the work on Phase 1 and Avant's inability to meet scheduled completion dates are described in Subsections F and G of Section I above.

## V.  POST-PETITION OPERATIONS

Debtor's post-petition operations have consisted mainly of finalizing the proposed Plan of Reorganization and the terms of the post-petition financing.  Debtor's representatives have also responded to all inquiries concerning potential purchases of all or portions of the Debtor's real estate.

## VI.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The classification and treatment of all claims and interests for purposes of the Debtor's proposed Plan is summarized on the chart attached as **Exhibit K** hereto. Detail concerning the classification and treatment of all claims and interests, including an explanation of whether each is impaired or unimpaired, is provided in **Article II** of the Plan.

Additional detail concerning certain key claims in this Chapter 11 Case and the legal basis for Debtor's proposed treatment of those claims in the Plan are provided below:

### A.    PRIORITY CLAIMS.

The quarterly fees due to the United States Trustee are the only priority claim in this case.  These fees will be paid when due so long as they apply.  The IRS filed a proof of claim, apparently as a protective matter, in case the Debtor's corporate income tax return was filed late, but it was filed on a timely basis.

### B.    ADMINISTRATIVE EXPENSE CLAIMS.

The only known claims in this category will be fees for Debtor's Counsel which will be submitted on fee applications to the Court, subject to objection by creditors, and a claim for substantial contribution pursuant to 11 U.S.C. § 503(b)(3)(D) and (b)(4) by

Meadowbrook and its counsel.  Debtor's Counsel's attorneys' fees will be paid from the $50,000 prepetition retainer deposited by Frank Belk and Richard Belk in Freeland & Freeland's trust account for payment of these fees and the filing fee for this Chapter 11 case.  It is believed that Meadowbrook's claim under § 503(b) would not exceed $50,000.

### C.  POST-PETITION FINANCING THROUGH MEADOWBROOK CAPITAL – FIRST PRIORITY, SECURED CLAIM

Upon confirmation of the Debtor's Plan, the proposed post-petition financing through Meadowbrook Capital will be secured by a first priority lien on the Debtor's assets on the terms set forth on the Term Sheet attached as **Exhibit C**.  The Plan contemplates that the post-petition financing will be put in place only following entry by the Court of an order confirming Debtor's Plan and entry by the Court of the form of proposed order attached hereto as **Exhibit L**, approving the terms of the Meadowbrook financing.

### D.  HERITAGE BANKING GROUP – SECURED CLAIM FOR PRE-PETITION CONSTRUCTION LOAN,

Upon confirmation of the Debtor's Plan with approval of the proposed post-petition financing by Meadowbrook, the lien of Heritage would be second in priority behind the lien of Meadowbrook's designee under the post-petition financing.  At least $1.3 million of the post-petition financing would, however, be paid as the hard costs of completing the construction of the Phase 1 building and would directly enhance the value of Heritage's collateral.

Heritage has filed a Proof of Claim that shows its claim as of the Petition Date as follows:  $3,961,661.80 in principal, $205,522.35 in interest, and $9,057.00 in attorneys' fees for a total claim of **$4,176,241.15**.

The Debtor anticipates that Heritage's secured claim will be roughly in this range, but will be asking, by filing an objection to the Proof of Claim, for a breakdown of advances, interest, and other charges and confirmation that (a) a 10% default rate was not used by mistake as indicated at one point by the Bank; (b) rents received for the Bouré space prepetition and postpetition have been applied to interest charges on this debt; and (c) that there were no charges in connection with one extension of the maturity of the loan without the consent of the Debtor.  The Debtor's Plan and the Projections assume that resolution of these disputed issues will not significantly reduce Heritage's claim below the amount shown on its Proof of Claim.

The Debtor's Plan proposes that Heritage's Allowed Claim be paid as follows:

1.     The Heritage indebtedness would be fixed (for purposes of amortization) as of the Petition Date and amortized over 20 years with interest at the sliding scale below with a balloon payment due at the earlier of (a) 5 years from confirmation of the Debtor's Plan; or (b) 1 year from completion of Phase 3.

2.     Payments of $7000 per month would be made until completion of Phase 1, with interest on the outstanding balance as of the Petition Date accruing at a 5.5% rate.

3.     Upon the completion of Phase 1 the Debtor would begin full 5.5% interest only payments.

4.     Upon sale of the first condo in Phase 1, the Debtor would make a $250,000 principal reduction payment.

5.     Upon sale of the second condo in Phase 1, the Debtor would make a second $250,000 principal reduction payment.

6.      Within 120 days of the sale of the second condo in Phase 1, the Debtor would pay all then accrued and unpaid interest at the 5.5% rate (with credit given for the $7000 per month payments received).

7.      Upon completion of Phase 2, the interest rate would increase to 6.5% and the Debtor would commence monthly payments of principal and interest on the modified obligation.

8.      It is the intention of the Debtor (and Meadowbrook) to actively seek alternative financing to take out the existing indebtedness to Heritage.

Under the Debtor's Plan if approved, Heritage would retain all of its legal, equitable, and contractual rights under its loan documents, including the guaranties of Frank Belk and Richard Belk, to secure payment of its secured claim on the terms set forth herein

## D.    AVANT CONSTRUCTION, INC. – SECURED CLAIM FOR CONSTRUCTION LOAN, AMOUNT DISPUTED

Avant's secured claim, including attorneys' fees is no more than $347,000 as shown on its amended Contstruction Lien Notice attached hereto as **Exhibit M.**

The Debtor has objections to at least **$17,422** in items improperly submitted on pay applications by Avant, including Christmas bonuses for Avant employees, overpayments for labor based on an audit of backup of a small percentage of the pay applications submitted by Avant, and inappropriate purchases of furniture, a camera, and computer equipment.

There is at least **$22,963** in amounts still owed to local vendors that were previously submitted by Avant on pay applications that have already been paid by the

Debtor. Under Mississippi law, these claims are now Avant's responsibility, not the Debtor's.

The amount of Avant's Allowed Claim turns on two legal issues: (1) whether the Debtor was entitled to terminate the Avant Contract for cause (for example, misleading certifications concerning payments to subs, failure to complete, etc.) or was only entitled to terminate "for convenience"; and (2) whether a construction control estimate complying with the express requirements of the Avant Contract and the AIA General Conditions was ever approved in writing by the Debtor in this case.

This Court's determination on those two legal issues, when applied to the pay applications and demands by Avant following termination, could result in the Avant claim being allowed in a range from zero to, at most, $145,171 plus attorneys' fees.

In any event, the Debtor also has a substantial counterclaim for damages and a right to setoff due to Avant's failure to complete the shell of the Phase 1 building by August 2008. This counterclaim and setoff right would include interest on the Heritage loan for at least 12 months of delay in completing Phase 1 and the cost of this bankruptcy proceeding and could negate any recovery by Avant in this case.

As a result, Debtor believes that the $347,000 amount in Avant's amended Construction Lien Notice significantly overstates its claim. Debtor is requesting that a claims allowance hearing be set to determine the allowed amount of Avant's secured claim for purposes of this Chapter 11 case prior to the confirmation hearing on the Plan.

While providing its analysis of the Avant claim in the interest of expediting resolution of it, Debtor reserves the right to raise other objections and defenses to the Avant claim at the allowance hearing.

### E.   EXECUTORY CONTRACT AND LEASE CLAIMS

Because the Debtor's Plan proposes to assume the pre-construction contracts for luxury condominiums and its leases for restaurant/retail space and because there are no defaults required to be cured or breach claims for this category of claimants, no payment should be required for executory contract and lease claims.

### F.   UNSECURED PRIORITY CLAIM OF BANCORPSOUTH BANK

The Debtor is indebted to BancorpSouth on a promissory note having an unpaid balance as of the Petition Date in the amount of $287,676.21 (the "BancorpSouth Loan").   The Debtor is also indebted to BancorpSouth on a guaranty of certain obligations owed by Belk Ford-Mercury, Inc.   The BancorpSouth Loan is secured by certain security interests and mortgage liens against the property of Belk Ford-Mercury, Inc., which is not property of the estate, and is guaranteed by guarantors other than Debtor.   For purposes of the Debtor's Plan, the indebtedness to BancorpSouth is classified as an unsecured claim.

As soon as practicable following confirmation of the Debtor's Plan, the Debtor will be authorized to and will execute and deliver to BancorpSouth a promissory note renewing and extending the BancorpSouth Loan for one (1) year with the Bancorp South Loan amortized over a period of not less than thirty (30) years.

The entire balance of unpaid principal and interest owed on the BancorpSouth Loan as of the date that such renewal note is executed shall become the new principal amount of the BancorpSouth Loan as renewed, and such shall be payable with interest at the rate of six percent (6.0%) per annum.   Accrued interest shall be paid by the Debtor monthly, and the entire balance of the BancorpSouth Loan shall be due and payable one

(1) year from the date of such renewal note.  Such renewal note shall remain secured by the same security interests and mortgages held by BancorpSouth pre-petition and shall remain guaranteed by the same guaranties held by BancorpSouth pre-petition.  Debtor shall cause the grantors of such security interests and mortgages and such guarantors to execute such further and additional documents, if any, as required by BancorpSouth in connection with such renewal.

### G.    GENERAL UNSECURED CLAIMS

The Debtor's Plan proposes to pay general unsecured claims as follows:  50% of the each Allowed Claim in this class will be paid in cash within 30 days after the post-petition financing is funded and the remaining 50% of each Allowed Claim in this class will be paid in cash within the following 60 days.  The amount of Allowed Claims in the General Unsecured class are anticipated to be no more than:  $8,600.00.

### F.    EQUITY INTERESTS

Under the Debtor's Plan if the proposed post-petition financing is approved, Frank Belk and Richard Belk will retain each retain 24.5% of the limited liability membership interests of the Debtor (the "LLC membership interests").  Meadowbrook's designee will receive 51% of the LLC membership interests.  Meadowbrook and the investors it identifies for the post-petition financing will also have certain rights to convert rights to payment to equity and to raise additional equity as set forth in the Term Sheet attached hereto as **Exhibit C**.

### VI.  FORCED LIQUIDATION VALUE AND RESULTS FOR CREDITORS

Based on the appraisal prepared by Darrell Bullock for Heritage, see **Exhibit D** attached hereto, the Debtor's property has a liquidation value of, at least, $4,767,000.

The Debtor's Plan includes a backup bid procedure to be conducted under Court supervision, if the post-petition financing does not close.    Under the circumstances, a foreclosure outside of bankruptcy could unnecessarily cut off rights and value for Avant and the other creditors and parties-in-interest.

## IX. "NEW VALUE"

Frank Belk and Richard Belk have provided a total of $50,000 as a pre-petition deposit in the trust account of Freeland & Freeland to cover the fees of Debtor's counsel and other administrative expenses of this estate.   The Debtor's Plan provides for all claims senior to the equity class to be paid in full.   Accordingly, Debtor believes that (1) the Debtor's Plan satisfies the "absolute priority" rule without "new value" being required for the equity holders to retain their interest; and (2) that the Debtor's present equity holders have offered sufficient "new value" to support confirmation of the Debtor's plan and allow them to retain the portion of their equity interests in the Debtor.

## X.  APPROVAL OF THE PLAN

It is important that you exercise your right to vote for the acceptance or rejection of the Plan.   The Debtor believes that confirmation of the Plan will maximize the recovery for all creditors.   Therefore, Debtor strongly urges you to vote to accept the Plan.

This the 15th day of January, 2010.


BELK PROPERTIES, LLC


By:  /s/ Frank Belk_____
        Frank Belk, Member/Manager

PREPARED BY:

Freeland & Freeland


By:  /s/ Joyce Freeland
     Joyce Freeland
     MBN 102183

## CERTIFICATE OF SERVICE

I, Joyce Freeland, do hereby certify that I have this day delivered a correct copy of the above and foregoing Disclosure Statement with the Debtor's Proposed Plan of Reorganization, as follows:

By electronically filing the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

U.S. Trustee  USTPRegion05.AB.ECT@usfdoj.gov

Les Alvis, Esq.  lalvis@tsixroads.com

William Trey Manhein, Esq.  tmanhein@wellsmar.com

Michael D. Simmons, Esq.  mike@cs-law.com

Ralph Germany  rgermany@babc.com

Mary Clay Morgan  mmorgan@babc.com

Ed Lawler, Esq.  elawler@mckaylawler.com

Jeb Bailey, Esq.  Jeb.Bailey@butlersnow.com

This the 15th day of January, 2010.

/s/ Joyce Freeland
Joyce Freeland